UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CINDY POULIN,

    Plaintiff,        Hon. Robert Holmes Bell

v.               Case No. 1:12-CV-1353

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

_____/


## REPORT AND RECOMMENDATION

    This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and

XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative

record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall

be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges

to submit proposed findings of fact and recommendations for disposition of social security appeals,

the undersigned recommends that the Commissioner's decision be **reversed and this matter**

**remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 51 years of age on her alleged disability onset date.  (Tr. 231).  She successfully completed high school and worked previously as a production worker, cashier, and waitress.  (Tr. 24, 313).

Plaintiff applied for benefits on September 8, 2008, alleging that she had been disabled since January 1, 2007, due to depression, anxiety, post-traumatic stress disorder, and attention deficit hyperactivity disorder. (Tr. 231-41, 304).  Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 110-230).  On April 24, 2012, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and a vocational expert.  (Tr. 65-109).  In a written decision dated June 21, 2012, the ALJ determined that Plaintiff was not disabled. (Tr. 15-25).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-6). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL EVIDENCE

On January 3, 2007, Plaintiff was taken to North Ottawa Community Hospital after ingesting a large number of Tylenol tablets.  (Tr. 430-31).  Plaintiff reported that "she woke up" and

"did not want to live any more and took the pills." (Tr. 430). Plaintiff was admitted to the hospital for treatment. (Tr. 431). The following day, Plaintiff was assessed to be "medically stable" at which point she agreed to a transfer to "an inpatient facility." (Tr. 432).

Upon admission to the Hackley Behavioral Health facility, Plaintiff "was very upset that she did not die" and "was threatening to hurt herself again." (Tr. 444). The doctor noted that Plaintiff had never before treated with a psychiatrist and that this was her first psychiatric hospitalization. (Tr. 444). Upon admission, Plaintiff "was severely depressed, had a lot of negative thinking, [was] very pessimistic, [and] threatened suicide." (Tr. 445). Plaintiff's "medications were adjusted and monitored" and "she subsequently became more social with her peers. . .and was more active in group activities although she reported not feeling very comfortable in a group setting." (Tr. 445). Plaintiff was discharged from the hospital on January 12, 2007, at which point she"was more positive about the future" and "felt that she has a lot to live for." (Tr. 446). Plaintiff was diagnosed with (1) major depressive disorder, recurrent, no psychosis; and (2) post traumatic stress disorder, chronic. (Tr. 446). Plaintiff's GAF score upon discharge was rated as 40.[1] (Tr. 446).

On February 6, 2007, Plaintiff began treatment with Manistee-Benzie Community Mental Health Services. (Tr. 510-16). Plaintiff reported that she recently moved to the Manistee area and was presently "staying with friends." (Tr. 510). Plaintiff reported that "she has been depressed for years, has been depressed most days, cries a lot, [and experiences] some sleep disturbance, poor concentration, periodic last of self-care." (Tr. 510). Plaintiff also reported that

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter DSM-IV). A GAF score of 40 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

she "has to push herself to function." (Tr. 510). With respect to her recent suicide attempt, Plaintiff reported that she "just snapped after keeping the fact that she had been repeatedly sexually abused by her step-father as a child." (Tr. 510). Plaintiff further reported that "she never told anyone about the sexual abuse" and was experiencing "a lot of pain and anger about this." (Tr. 510). Plaintiff's mood was characterized as "detached/apathetic" and her affect was characterized as "blunted." (Tr. 513). The results of a mental status examination were otherwise unremarkable. (Tr. 513-14). Plaintiff was diagnosed with "severe" major depressive disorder and post trauma stress disorder. (Tr. 516). Plaintiff was also observed to exhibit "some compulsive traits." (Tr. 516). Plaintiff's GAF score was rated as 50.[2] (Tr. 516).

On February 27, 2007, Plaintiff was examined by Dr. Gregory Green with Manistee-Benzie Community Mental Health Services. (Tr. 521-23). Plaintiff reiterated that "she has a history of depression on and off throughout the years" and "suffered sexual abuse that was ongoing until she left home at age 16 from her stepfather." (Tr. 521). Plaintiff further reported that "sometime in December she started to feel the urge to disclose this to members of her family who she trusted [and] at some point, she became more and more depressed and eventually overdosed." (Tr. 521). Plaintiff reported that "in terms of the depression, things are under good control at this point" and that she "occasionally has some anxiety but it's managed well by her medications." (Tr. 521). Plaintiff also reported that she "is actively looking for a job" and "hopes to get employment soon." (Tr. 521). The results of a mental status examination were unremarkable. (Tr. 522). The doctor diagnosed Plaintiff

_____

[2] A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

with "moderate" major depressive disorder and noted that since moving to the Manistee area Plaintiff "has been doing quite well." (Tr. 522).

Plaintiff treated regularly with Manistee-Benzie Community Mental Health Services through April 24, 2007. (Tr. 506-09). Plaintiff discontinued treatment because she had to move from the Manistee area. (Tr. 508). Specifically, Plaintiff "had not been able to find employment [and] could no longer live where she was living." (Tr. 508). Plaintiff's condition upon discontinuing treatment was characterized as "somewhat improved" and her GAF score was rated as 55.[3] (Tr. 507-08).

On May 9, 2007, a family member transported Plaintiff to the hospital because she was experiencing "anxiety, depression, and suicidal thoughts." (Tr. 530). An initial assessment revealed that Plaintiff "is very depressed and is having suicidal thoughts with plan to overdose to end her life leading to this admission." (Tr. 533). It was further noted that Plaintiff "needs inpatient crisis stabilization." (Tr. 533). Plaintiff's GAF score was rated as 10.[3] (Tr. 533). Plaintiff received treatment, including modification of her medication regimen, over the next eight days. (Tr. 534-37). Plaintiff was discharged from the hospital on May 17, 2007, at which point her GAF score was rated as 57. (Tr. 534-37).

Treatment notes dated July 16, 2007 indicate that Plaintiff "cannot sleep and has missed work due to not sleeping." (Tr. 586). On July 27, 2007, Plaintiff reported that she was "having high anxiety," but "needs to go to work." (Tr. 585). Plaintiff requested medication because

---

[3] A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

[3] A GAF score of 10 indicates that the individual is experiencing "persistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death." DSM-IV at 34.

"she cannot go to work without a pill." (Tr. 585). Treatment notes dated July 30, 2007, indicate the following:

> Cindy states her anxiety is increasing due to her inability to keep struggling. Cindy states she has been struggling for too long and she is used to being independent and taking care of herself. Living with her brother and being financially strapped is overwhelming at this time. Cindy states her anxiety disables her, but at the same time, Cindy states she is able to pretend like everything is okay and go to work, even though inside she is still a wreck.

(Tr. 584).

Treatment notes dated July 24, 2007, from Community Mental Health Services of Muskegon County, indicate that Plaintiff was "o.k." and that she was working "part time at Sears, 25 hours a week." (Tr. 603). Plaintiff also reported that she "interacts with friends and does her household tasks." (Tr. 603). Plaintiff rated "her mood as a 5/10 with 10 being very happy." (Tr. 603). Plaintiff rated her anxiety as "high, 8/10 with 10 being anxious." (Tr. 603).

Treatment notes dated August 31, 2007, indicate that Plaintiff was experiencing "an extreme amount of stress" due to circumstances regarding her son and became "so tearful she had to leave work." (Tr. 581). Treatment notes dated December 28, 2007, indicate that Plaintiff "is working 40 hours per week between her two jobs and she is enjoying being busy and having things to do." (Tr. 572). Treatment notes dated October 17, 2007, indicate that Plaintiff's mood was "a bit low, a 3-4 out of 10, 10 being very happy" and that she was experiencing "intermittent suicidal thoughts." (Tr. 599). It was further observed that Plaintiff "continues to work part time at Sears. (Tr. 599).

Treatment notes dated November 30, 2007 indicate that Plaintiff was no longer working at Sears, but was instead working "part-time" at Sam's Club. (Tr. 597). Plaintiff reported

her mood as "8 out of 10, 10 being very happy" and described her anxiety as "3 out of 10, 10 being very anxious." (Tr. 597). Treatment notes dated February 8, 2008, indicate that Plaintiff was doing "okay," although she continued to experience intermittent suicidal thoughts. (Tr. 595). Plaintiff reported her anxiety as "6-7 out of 10, 10 being very anxious" and reported experiencing difficulties with concentration. (Tr. 595).

On March 31, 2008, Plaintiff reported that "I haven't been feeling well" and "I've been crying and feeling worthless." (Tr. 565). Plaintiff's therapist observed that Plaintiff was "tearful throughout session." (Tr. 565). Treatment notes dated April 17, 2008, indicate that Plaintiff was "doing okay" and that she was excited because she recently "signed a lease to move out on my own with a roommate." (Tr. 563). On June 18, 2008, Plaintiff reported that living with her friend was "difficult because she does not keep the house the way I would, but she's trying." (Tr. 559).

Treatment notes dated June 17, 2008, indicate that Plaintiff was experiencing "terrible" difficulties with concentration. (Tr. 591). Plaintiff rated her mood as "5 out of 10" and her anxiety as "6 out of 10." (Tr. 591). Plaintiff reported that she "continues to work at Sam's Club part time" and that it was "going well." (Tr. 591). On September 29, 2008, Plaintiff reported that "she is continuing to work part time," but "feels too overwhelmed to take on any additional hours or jobs." (Tr. 676). Plaintiff further reported that she "is hesitant to apply [for disability benefits] because she does ultimately want to work, however she cannot survive on part time work and emotionally it is all she feels capable of doing." (Tr. 676).

Treatment notes dated November 18, 2008, indicate that Plaintiff "was fired from [her] job...due to her drawer being short and poor attendance." (Tr. 674). Plaintiff reported that "her poor attendance was directly related to her mental health." (Tr. 674). Plaintiff's counselor reported

that Plaintiff was "disheveled" and "tearful throughout this session." (Tr. 674). Later that day, Plaintiff was taken to the hospital after she began expressing thoughts of suicide. (Tr. 680-83). Plaintiff was hospitalized for treatment and discharged two days later. (Tr. 680-83).

On November 18, 2008, Plaintiff reported experiencing "anxiety, poor focus and concentration and mood swings." (Tr. 655). Plaintiff reported that "she feels that none of her medications are working at all." (Tr. 655). Plaintiff requested to be hospitalized because that "would be a better place for her to be in while her medications get adjusted." (Tr. 655). Plaintiff's doctor declined Plaintiff's request for hospitalization and instead adjusted her medication. (Tr. 653). Plaintiff, despite the change in her medication, "started to feel unsafe, started to feel suicidal" and returned to her doctor three days later. (Tr. 653-54). Plaintiff reported that "she could get hold of a gun and put the gun to her head but decided to come in instead." (Tr. 653). Plaintiff also reported that "her attention and focus is not good." (Tr. 653). The doctor observed that "this is obvious[ly] due to the fact that she was fired from her job and is not functioning well." (Tr. 653). Plaintiff was admitted to the hospital for treatment. (Tr. 651). Treatment notes dated November 24, 2008, indicate that Plaintiff "is doing a little bit better today" and that "her mood is improved since over the weekend." (Tr. 651).

Treatment notes dated December 30, 2008, indicate that Plaintiff's mood was "depressed and dysthymic" and that her affect was "constricted with hardly any modulation." (Tr. 649). Plaintiff reported that "her depression is getting the better of her." (Tr. 649).

On January 20, 2009, Joe DeLoach, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 684-97). Determining that Plaintiff suffered from ADHD, Bi-Polar Disorder, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, and

Personality Disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Sections 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.08 (Personality Disorders) of the Listing of Impairments. (Tr. 685-93). The doctor determined, however, that Plaintiff failed to satisfy the Part B criteria for these particular Listings. (Tr. 694). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, but experienced three previous episodes of decompensation, each of extended duration. (Tr. 694).

Dr. DeLoach also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 698-701). Plaintiff's abilities were characterized as "moderately limited" in nine categories. (Tr. 698-99). With respect to the remaining 11 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 698-99).

On December 7, 2009, Plaintiff participated in a neuropsychological evaluation the results of which revealed that Plaintiff was experiencing "a moderate, almost severe degree of depression." (Tr. 723-26). Plaintiff's performance on a mental status examination "was in the borderline range and indicates a possible dementia process and/or mood disorder." (Tr. 725). Plaintiff's abstract reasoning, mentation speed, and cognitive shift ability were all characterized as "impaired." (Tr. 725). The doctor administering this evaluation concluded that "durable power of attorney for financial and legal matters is also suggested." (Tr. 726).

Treatment notes dated September 14, 2010, indicate that Plaintiff was "feeling increased anxiety and some depression due to her circumstances." (Tr. 710). Plaintiff's therapist reported that Plaintiff "appears to be tense and anxious, depressed." (Tr. 710).

On September 21, 2010, Plaintiff called her therapist. (Tr. 709). Plaintiff reported that she was scheduled to participate in a consultive examination with a psychologist in early October. (Tr. 709). Plaintiff stated that she was "afraid to go alone" to this appointment and asked the therapist if she would accompany her. (Tr. 709). The therapist reported that Plaintiff "sounded very tired and unsure of herself on the phone" and that "the anxiety of meeting with the [Social Security] appeals judge is really scaring her." (Tr. 709).

On October 8, 2010, Plaintiff participated in a consultive examination conducted by psychologist Dennis Mulder, Ed.D. (Tr. 718-22). Plaintiff reported that "she feels hopeless, useless, and worthless." (Tr. 718). Plaintiff reported that she "has thoughts of suicide all the time, but she has no intentions or plans of hurting herself or anyone else." (Tr. 718). Plaintiff reported that she "has no interest or motivation" and "does withdraw from others and isolate herself." (Tr. 718). Plaintiff also reported that she experiences anxiety "if she has to go someplace by herself." (Tr. 719). Plaintiff reported that she "lives in an apartment alone" and does not participate in any "hobbies, interests, or activities." (Tr. 720). Plaintiff reported that "she spends most of her time currently watching television or sleeping," but "does some of the vacuuming, dusting, cooking, dishes, and laundry but no yard work." (Tr. 720). Plaintiff reported that "she is not actively involved in any activities outside of her home." (Tr. 720). The doctor observed that Plaintiff "was cooperative but rather subdued and depressed looking as well as being nervous." (Tr. 720). The doctor further noted that Plaintiff's "affect was depressed and anxious." (Tr. 720). The doctor

observed that Plaintiff "continues to have thoughts of suicide" and "does present with symptoms that are consistent with a diagnosis of PTSD." (Tr. 721-22). The doctor reported that Plaintiff "appeared to be honest and direct in her responses to my questions without evidence of malingering or exaggeration of pathology." (Tr. 718). Dr. Mulder diagnosed Plaintiff with: (1) major depressive disorder-recurrent, moderate; (2) generalized anxiety disorder and; (3) post traumatic stress disorder. (Tr. 722). The doctor's prognosis for Plaintiff was as follows:

> The potential for the patient becoming gainfully employed in a simple, unskilled work situation on a sustained and competitive basis is guarded. The patient's psychological condition greatly interferes with her ability to function at a level necessary for her to obtain and maintain full-time, gainful employment. The patient has a history of psychiatric treatment since 2007, but this has only been mildly significant or effective. Her anxiety causes her great distress to the point that she has difficulty leaving her home. The patient would likely be an unreliable and undependable employee. It is my opinion that the patient meets the Listings at 12.04 and 12.06 and that she has been unable to work since November of 2007.

(Tr. 722).

Treatment notes dated October 31, 2011, indicate that Plaintiff's depression and anxiety both "rated about 7" on a scale of 1 to 10. (Tr. 729). It was further noted that Plaintiff "has tried to go back to work in the past a couple of times, though hasn't been able to be successful because when she is depressed she socially isolates instead of participating in activities and remains confined to her house." (Tr. 729).

On December 7, 2011, Plaintiff participated in a consultive examination conducted by Allison Bush. (Tr. 749-53). Plaintiff reported that she was unable to work due to depression, anxiety, and PTSD. (Tr. 749). Plaintiff reported that she was fired from her previous two jobs because she became "so depressed that [she] wouldn't go" and instead "just stayed in bed." (Tr.

749). Plaintiff also reported that she does not like to be around people and that her son takes her to the store either "late or really early so there's not so many people." (Tr. 749). Plaintiff reported that she does not presently have any hobbies but that she will "sometimes go for a walk." (Tr. 750). She further reported that "about twice per month" she visits with a girlfriend. (Tr. 750). Plaintiff reported that "she does do her own cleaning and laundry," but "a couple times a week...I just don't get out of bed at all." (Tr. 750). The examiner described Plaintiff as "pale" with "dark circles under her eyes" and that she "displayed a blank flat expression throughout the examination." (Tr. 751). Plaintiff reported that she cries "a lot" and "almost every day" experiences "anxiety where my heart races and my legs shake." (Tr. 751). Bush concluded that Plaintiff "is able to understand, retain and follow simple instructions." (Tr. 752-53). Bush further observed, however, that "a return to a structured, repetitive type employment setting 6-8 hours per day 5 days a week may lead to further decompensation." (Tr. 753).

Treatment notes dated January 9, 2012, indicate that Plaintiff "is struggling with feelings of depression, futility, and generalized anxiety." (Tr. 785). It was further observed that Plaintiff "is somewhat socially withdrawn" and "has difficulty in keeping on with daily activities" and "has difficulty with focus and concentration." (Tr. 785). Plaintiff rated her depression as 8 on a scale of 1 to 10 and her anxiety as 7 on a scale of 1 to 10. (Tr. 785). The doctor observed that Plaintiff "will have significant difficulty in interacting with the public and carrying out commands." (Tr. 785).

On January 17, 2012, Dr. Virgilio Vasquez provided a sworn statement regarding Plaintiff's condition. (Tr. 761-74). Dr. Vasquez reported that he had been employed as a staff psychiatrist at Community Mental Health for the previous four to five months. (Tr. 764). The doctor

reported that during this time he had examined Plaintiff "about three times." (Tr. 764). The doctor reported that Plaintiff experiences a "pervasive loss of interest in almost all activities." (Tr. 767). The doctor reported that when Plaintiff "is depressed, she has some psychomotor retardation; and when she is in a mood that she is really up, she is agitated." (Tr. 767). The doctor further noted that Plaintiff "does have a tremendous amount of difficulty focusing and with concentration [and] she has difficulty relating to people or being around people because of her generalized anxiety." (Tr. 767). The doctor observed that Plaintiff "withdraws when she is depressed [and] she doesn't want to do anything." (Tr. 768). Dr. Vasquez reported that Plaintiff "also has difficulty in focusing and concentration" and "has had periods of decompensation, in which she really just can't make it - she just can't function." (Tr. 768). The doctor also reported that when Plaintiff "is depressed, she doesn't go out...will stay in bed...[and] has spent days and days in bed without getting out of bed." (Tr. 768). The doctor concluded that Plaintiff was not able to "engage in gainful employment on a full-time, sustained basis" because she "is not able to relate in any social situations, is not able to maintain any degree of focus and concentration [and] she is not able to function in a work environment." (Tr. 768-69).

Treatment notes dated April 2, 2012, indicate that Plaintiff "seems to be doing very well." (Tr. 808). Plaintiff "rate[d] her anxiety about 6, depression about 4." (Tr. 808). It was noted, however, that Plaintiff "has periods of anxiety that prevent her from going out" and that "she seemed to be spending a lot of time at home." (Tr. 808). The doctor rated Plaintiff's GAF score as 50 and noted that she was "unable to work." (Tr. 808).

On April 24, 2012, Counselor Kelly France provided a sworn statement regarding Plaintiff's condition. (Tr. 788-802). France reported that she had been treating Plaintiff

"intermittently, since 2007." (Tr. 791). France reported that Plaintiff was suffering from post-traumatic stress disorder, "mood disregulation that would be characterized as bipolar II," and an anxiety disorder. (Tr. 793). France reported that Plaintiff experiences "pervasive loss of interest in almost all activities" as well as "difficulty concentrating or thinking." (Tr. 795). France reported that part of her treatment for Plaintiff was "to increase her ability to function, increase her exposure in the community...getting to a place where she was willing to risk volunteering." (Tr. 796). France reported that Plaintiff progressed to the point where "she did try to do some volunteer work on a very limited basis." (Tr. 796). This attempt was unsuccessful, however, because "coping with the stress that volunteering incorporated, having to deal with people and having to be accountable for her time - she just couldn't do it, and she was eventually asked to leave." (Tr. 796). France reported that this failed attempt at volunteering "was more proof that she is, you know, very limited in her ability." (Tr. 796). France further reported that Plaintiff "is capable of probably getting somebody to hire her," but "I don't think the job would last very long [because] she is not able to maintain." (Tr. 798).

On July 6, 2012, Plaintiff was again hospitalized after becoming suicidal. (Tr. 812). Plaintiff remained in the hospital until July 11, 2012. (Tr. 812).

Plaintiff testified at the administrative hearing that she was fired from her part time job at Sam's Club because she "wasn't real friendly" and "missed a lot of days." (Tr. 81). Plaintiff reported that she no longer drives a vehicle because she no longer trusts her judgment. (Tr. 84). With respect to the volunteer position that she obtained at Kelly France's urging, Plaintiff reported that she worked as a cashier in the hospital gift shop "about four and a half or five" hours per week. (Tr. 87). Plaintiff reported that she was able to perform this job for "about three months," but was "let go" because she "didn't smile enough" and "didn't interact with the customers enough." (Tr.

88).  When asked what current difficulties would prevent her from working on a full time basis,

Plaintiff reported that as a result of her depression she simply remains in bed "two or three days out

of the week."  (Tr. 90).  Plaintiff reported that she has "a very ha[r]d time" interacting with other

people.  (Tr. 90).  Plaintiff also reported that she experiences difficulty focusing and concentrating.

(Tr. 90).  As a result, Plaintiff reported that she is unable to read.  (Tr. 90-91).  Plaintiff reported that

she also has lost interest in most activities and only leaves her residence to attend weekly therapy

sessions and to purchase groceries every other week.  (Tr. 91).  Plaintiff testified that she experiences

crying spells "a couple times a week."  (Tr. 92).


## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating

disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4]  If the Commissioner can make a

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§

404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional

---

[4]1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled"
regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and
which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled"
will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be
made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age,
education, past work experience, and residual functional capacity must be considered to determine if other work can
be performed (20 C.F.R. 404.1520(f)).

16

impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from (1) chronic sinusitis; (2) depression; (3) post-traumatic stress disorder; and (4) substance dependence, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18-21). With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform medium[5] work subject to the following limitations: (1) she must avoid concentrated exposure to pulmonary irritants; (2) she is limited to the performance of simple tasks which require only occasional contact with the public, co-workers, and

---

[5] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).

supervisors; and (3) she cannot perform fast-paced work or work with production quotas. (Tr. 21). The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Susan Rowe.

The vocational expert testified that there existed approximately 7,900 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 101-03). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

# I.        The ALJ Properly Evaluated the Opinion Evidence

Two of Plaintiff's care providers, Dr. Vasquez and Kelly France, offered opinions regarding Plaintiff's impairments and limitations. The ALJ afforded "only limited weight" to these opinions. (Tr. 19). Plaintiff asserts that she is entitled to relief because the ALJ improperly evaluated these particular opinions.

## A.        Dr. Vasquez

As detailed above, Dr. Vasquez reported that Plaintiff experiences a "pervasive loss of interest in almost all activities." The doctor reported that Plaintiff experiences "a tremendous amount of difficulty focusing and with concentration [and] she has difficulty relating to people or being around people because of her generalized anxiety." The doctor also reported that Plaintiff experiences "periods of decompensation, in which she really just can't make it - she just can't function." Accordingly, Dr. Vasquez concluded that Plaintiff was not able to "engage in gainful employment on a full-time, sustained basis" because she "is not able to relate in any social situations, is not able to maintain any degree of focus and concentration [and] she is not able to function in a work environment."

While Dr. Vasquez offered a rather pessimistic view of Plaintiff's overall condition, he failed to articulate any specific functional limitation from which Plaintiff allegedly suffers. Instead, the doctor offered vague generalities concerning Plaintiff's ability to work. Thus, it simply cannot be determined whether the ALJ's RFC determination, which likewise recognizes that Plaintiff suffers from emotional and cognitive limitations, is inconsistent with Dr. Vasquez's opinion. It is not error for an ALJ to fail to accord controlling weight to such a vague and generalized opinion.

*See Ritter v. Commissioner of Social Security*, 2013 WL 427572 at *5 (S.D. Ohio, Feb. 4, 2013); *Bennett v. Commissioner of Social Security*, 2011 WL 1230526 at *4 (W.D. Mich., Mar. 31, 2011). Furthermore, to the extent that Dr. Vasquez opined that Plaintiff is disabled or unable to work, such is entitled to no weight as the determination of whether a claimant is disabled is a matter reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); *Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004) ("[t]he determination of disability is [ultimately] the prerogative of the [Commissioner,] not the treating physician").

B.      Kelly France

As described above, France likewise offered a rather pessimistic opinion of Plaintiff's ability to perform work activities. Just as with Dr. Vasquez's opinion, however, France's opinion is vague and fails to articulate any specific functional limitation from which Plaintiff allegedly suffers. While France offers vague opinions that Plaintiff would experience certain difficulties obtaining (and sustaining) full-time employment, it cannot be determined whether the ALJ's RFC determination, which likewise recognizes that Plaintiff suffers from emotional and cognitive limitations, is inconsistent with France's opinion. Thus, the ALJ did not err in failing to accord controlling weight to France's opinion. Moreover, to the extent that France offered the opinion that Plaintiff is disabled or unable to work, such is entitled to no weight for the reasons articulated above.

In sum, because the opinions in question were vague and articulated no specific functional limitations, or offered opinions on matters reserved to the Commissioner, it simply cannot be determined whether such are inconsistent with the ALJ's RFC determination. Thus, the Court discerns no error in the ALJ's evaluation of such.

**II.**          **The ALJ's Credibility Assessment is not Supported by Substantial Evidence**

As described above, Plaintiff testified at the administrative hearing that she was impaired to an extent well beyond that recognized by the ALJ. Specifically, Plaintiff reported that she experienced depression, difficulty interacting with others, and cognitive difficulties all of which prevent her from working. Plaintiff also reported that her recent attempts to perform part-time and volunteer work were unsuccessful because of these limitations. The ALJ, however, discounted Plaintiff's allegations on the ground that Plaintiff was not credible. Plaintiff asserts that the ALJ's credibility assessment is not supported by substantial evidence.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit recently stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Commissioner of Social Security*, - - - Fed. Appx. - - -, 2013 WL 5496007 at *3 (6th Cir., Oct. 4, 2013) (citation omitted).

Nevertheless, "blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Minor v. Commissioner of Social Security*, 2013 WL 264348 at *16 (6th Cir., Jan. 24, 2013). Furthermore, the ALJ must "consider all objective medical evidence in the record, including medical signs and laboratory findings, where such evidence is produced by acceptable medical sources." *Id.*

In discounting Plaintiff's subjective allegations, the ALJ concluded that the medical evidence was consistent with his RFC determination. (Tr. 22). To the contrary, the medical evidence and reports from Plaintiff's care providers support Plaintiff's allegations and are inconsistent with the ALJ's RFC determination. For example, in October 2010, Dr. Mulder examined Plaintiff, concluding that her "psychological condition greatly interferes with her ability to function at a level necessary for her to obtain and maintain full-time, gainful employment." (Tr. 718-22). Treatment notes from October 2011 indicate that Plaintiff's recent attempts to return to work were unsuccessful. (Tr. 729). In December 2011, Allison Bush examined Plaintiff and concluded that if Plaintiff returned to full-time employment such "may lead to further decompensation." (Tr. 753). In January 2012, Dr. Vasquez reported that Plaintiff was unable to perform sustained, full-time work as a result of her emotional and cognitive limitations. (Tr. 767-69). Treatment notes from April 2012, indicate that Plaintiff's recent attempt to perform limited volunteer work was unsuccessful due to her emotional and cognitive impairments. (Tr. 795-98). Moreover, in July 2012, Plaintiff suffered a "relapse," expressing suicidal thoughts, requiring her to be hospitalized. (Tr. 812).

The ALJ dismissed Plaintiff's allegations of cognitive difficulty on the additional ground that Plaintiff "has been able to appropriately answer questions posed to her during both hearings and during various treatment appointments." (Tr. 19). The shortcoming in the ALJ's logic is twofold. First, that Plaintiff may be able to "answer questions" for a brief period of time hardly equates with the ability to perform the demands of sustained full-time work. Moreover, while Plaintiff may have been able to "answer questions" during her various examinations and treatment sessions, the ALJ seems to have overlooked the fact that Plaintiff's care providers interpreted Plaintiff's responses as evidencing an inability to function at a level consistent with the ALJ's RFC.

In sum, the ALJ's decision to discount Plaintiff's credibility is not supported by substantial evidence.

## III.      The ALJ's RFC Determination is not Supported by Substantial Evidence

As noted above, the ALJ concluded that Plaintiff retains the ability to perform medium work subject to the following limitations: (1) she must avoid concentrated exposure to pulmonary irritants; (2) she is limited to the performance of simple tasks which require only occasional contact with the public, co-workers, and supervisors; and (3) she cannot perform fast-paced work or work with production quotas. Plaintiff argues that the ALJ's RFC fails to sufficiently account for her impairments and the limitations imposed by such. The Court agrees.

As the evidence detailed above makes clear, Plaintiff 's ability to work is impaired to an extent greater than that recognized by the ALJ. More specifically, as the discussion in the preceding section reveals, simply limiting Plaintiff to occasional contact with others and slower-

paced work hardly accounts for her emotional and cognitive impairments and limitations. The Court concludes, therefore, that the ALJ's RFC determination is not supported by substantial evidence.

**IV.        Remand is Appropriate**

The ALJ's conclusion that Plaintiff is not disabled was based on his assessment of Plaintiff's credibility as well as the vocational expert's testimony that there existed a significant number of jobs which Plaintiff could perform consistent with her RFC. As discussed above, the ALJ's assessment of Plaintiff's credibility is faulty and renders the ALJ's decision infirm. Moreover, because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision is not supported by substantial evidence, there does not exist *compelling* evidence that Plaintiff is disabled. In sum, evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance. The Court concludes, therefore, that the Commissioner's decision must be reversed and this matter remanded for further factual findings.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: February 27, 2014                                  /s/ Ellen S. Carmody
                                                         ELLEN S. CARMODY
                                                         United States Magistrate Judge